NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| TERESSA LOPEZ, Administratrix ad Prosequendum of the Estate of RICHARD A. NORDSTROM and EDWARD NORDSTROM | : : : : : | |
| Plaintiff, | : : | Civil Action No. 12-03167 (JAP) |
| v. | : : | **OPINION** |
| MICHAEL LYNCH, BRIAN COLLINS, SHAWN CAVALCANTE, WILLIAM BRASE, MANCHESTER TOWNSHIP, MANCHESTER TOWNSHIP POLICE DEPARTMENT, and JOHN DOES, | : : : : : : | |
| Defendants. | : : | |

PISANO, District Judge

Presently before the Court are three motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56: (1) Defendant Michael Lynch's ("Defendant Lynch" or "Officer Lynch") Motion for Summary Judgment [docket #20]; (2) Defendants' Shawn Cavalcante ("Defendant Cavalcante" or "Officer Lynch") and Brian Collins ("Defendant Collins" or "Officer Collins") Motion for Summary Judgment [docket #21]; and (3) Defendants William Brase, Manchester Township, and the Manchester Township Police Department's Motion for Summary Judgment [docket #22].  Plaintiff, Teressa Lopez, Administratrix ad Prosequendum of the estate of Richard A. Nordstrom and Edward Nordstrom ("Plaintiff") opposes these motions [docket #28]. The Court considered the papers filed by the parties and rules on the written submissions without oral argument pursuant to Federal Rule of Civil Procedure 78.

For the reasons that follow, this Court GRANTS Defendant Lynch's Motion for Summary Judgment [docket #20]; GRANTS Defendants Cavalcante and Collins' Motion for Summary Judgment [docket #21]; and GRANTS Defendants William Brase, Manchester Township, and the Manchester Township Police Department's Motion for Summary Judgment [docket #22].

## I.    BACKGROUND

On May 30, 2010, Officers Lynch, Cavalcante, and Collins responded to a 911 call at the home of Edward Nordstrom located at 3219 Wilbur Avenue, Manchester, New Jersey.  Defendant Michael Lynch's Statement of Material Facts ("Lynch's SUMF"), at ¶¶ 1, 65.  The family members living in the home at this time were Edward Nordstrom and his wife Darlene, their son Richard ("Decedent"), and their grandson, Andrew. Lynch's SUMF, at ¶ 10.  The 911 call was placed as a result of a domestic violence incident.[1] It was reported that the Decedent was intoxicated and was assaulting his nephew, Andrew, then 22 years old. Lynch's SUMF, at ¶¶ 11-13.  The Manchester Township police dispatcher reported the call as a domestic violence incident in progress, indicating that alcohol was involved.  Lynch's SUMF, at ¶ 64.

When the Defendant officers arrived at the home, Defendant Collins spoke with Andrew, who gave the Officer a summary of why he had called the police. Lynch's SUMF, at ¶ 71a. Officer Collins was familiar with the Decedent because he had arrested him for domestic violence problems and seized weapons from him in the past.  Lynch's SUMF, at ¶ 71b.  When the Officers asked Andrew where the Decedent was, he pointed to the garage.  Lynch's SUMF, at ¶ 74.  As such, the Officer's left the area of the house and walked in the direction of the detached garage. Lynch's SUMF, ¶ 86.

---

[1] The Court need not go into detail on the circumstances surrounding the assault, as it is irrelevant for purposes of this motion.

The detached garage had two (2) large open bay doors.  Lynch's SUMF, ¶ 90; Certification of Michael J. McKenna ("McKenna Cert."), at Ex. J.  Defendant Collins went around the structure to walk behind it, while Defendants Lynch and Cavalcante entered the garage through the open right bay door.  Lynch's SUMF, at ¶¶ 87, 91.  Inside, a cement wall physically divided the side of the garage where the Officers were from an adjoining workshop where the Decedent was; however, this cement wall contained two (2) eye level windows.  Lynch's SUMF, at ¶¶ 95-96; McKenna Cert., at Ex. J.  Eventually, Officer Lynch established visual contact of the Decedent through the left window, and Officers Cavalcante and Collins were standing on either side of Officer Lynch.  Lynch's SUMF, at ¶ 108-109.

While standing near the window, Officer Lynch was covering the Decedent and had his weapon drawn and tactical light on.  Lynch's SUMF, at ¶ 111.  As Officer Lynch covered the Decedent, Officers Cavalcante and Collins attempted to communicate with him.  Lynch's SUMF, at ¶ 112.  The Officers insisted that the Decedent come out of the workshop area, and the Decedent refused by stating "I'm not coming out. You can come in but I'm not coming out."  Lynch's SUMF, at ¶¶ 113-115.  A few seconds later, Defendant Lynch observed a black spout protruding from the Decedent's right hand, and as the Decedent started circling around, Defendant Lynch saw that it was a red gasoline can.  Lynch's SUMF, at ¶¶ 120-121.  The Decedent began pouring gasoline on his legs, feet, and the ground around his feet, while the Officers ordered him to drop the gas can.  Lynch's SUMF, at ¶¶ 122-123.  The Officers noticed that the Decedent was also holding a utility lighter, so Defendants Cavalcante and Collins immediately left the garage to attempt to get into the workshop and "remove the lighter from [the Decedent's] hands so he didn't light himself on fire."  Lynch's SUMF, at ¶¶ 125-129; McKenna Cert., at Ex. M, p. 28.

While Officer's Cavalcante and Collins attempted to enter the workshop side of the garage through an exterior door, Officer Lynch remained by the window and instructed the Decedent to drop the lighter. Lynch's SUMF, at ¶¶ 131-137. The exterior door was locked so Officer Cavalcante tried forcing the door open by hitting it with a shovel. Lynch's SUMF, at ¶¶ 131-132. Officer Cavalcante initially struck the wood part of the door but when that did not work, he broke the glass window part of the door. Lynch's SUMF, at ¶ 133. Defendant Lynch was still standing in the garage near the left window and could hear his fellow Officers attempting to gain entry through the exterior door. Lynch's SUMF, at ¶¶ 134-135. A few seconds later, the Decedent squatted down then stood up, facing the doorway where Officers Cavalcante and Collins were attempting to gain entry, and raised what appeared to be a sawed-off shotgun with his right arm, pointing it at the door. Lynch's SUMF, at ¶¶ 138-140. Officer Lynch could see the Decedent's left profile, and when the Decedent raised the shotgun, was also able to see the barrel and the pump action of the shotgun. Lynch's SUMF, at ¶¶ 142-144. Believing that Officers Cavalcante and Collins' lives were in danger, Officer Lynch shot the Decedent. Lynch's SUMF, at ¶¶ 145-146. Officer Lynch did not observe a reaction by the Decedent after being struck with the first shot in his torso, and the Decedent was still holding the shotgun, so Officer Lynch fired a second shot striking the Decedent in the back of the left shoulder. Lynch's SUMF, at ¶¶ 150-154.

After being hit with the second shot, the Decedent fell into the doorway leading into the storage area. Lynch's SUMF, at ¶ 156. Defendant Lynch remained in a cover position and called out to Defendants Cavalcante and Collins to stay out of the workshop because the Decedent was armed. Lynch's SUMF, at ¶ 163. Officer Cavalcante initially stepped inside the workshop with his weapon drawn, but he stopped when he was informed by Defendant Lynch that the Decedent had a gun. Lynch's SUMF, at ¶ 165; McKenna Cert., at Ex. M, pp. 31-36. Officer Cavalcante

took a cover position with his weapon drawn and pointed in the direction of the Decedent, while Officer Lynch remained in the garage near the window for about two (2) minutes. Lynch's SUMF, at ¶¶ 168-169; McKenna Cert., at Ex. D, pp. 80-81. After these two (2) minutes, a supervisor, Sergeant Mark McClellan arrived and assumed control of the scene.[2] Lynch's SUMF, at ¶ 169.

Sgt. McClellan walked back to the garage and saw Officers Cavalcante and Collins near the exterior door and Officer Lynch inside the left bay door near the window holding his firearm in his outstretched hands. Lynch's SUMF, at ¶¶ 186-190. After a brief exchange with the Officers, Sgt. McClellan asked "where is he?" and walked into the workshop. Lynch's SUMF, at ¶¶ 191-192; McKenna Cert., at Ex. G, pp. 33-34. Sgt. McClellan regarded the Decedent as an unsecured threat and was the first person to approach and look into the workshop area after the shots were fired. Lynch's SUMF, at ¶¶ 193-194. As he entered the area, Sgt. McClellan had his firearm out and "noticed what appeared to be a double barrel sawed-off shotgun with [the Decedent's] hand resting on it . . ." Lynch's SUMF, at ¶ 196; McKenna Cert., at Ex. G, pp. 33-34. "At that point, [Sgt. McClellan] kicked the weapon out of the way and it actually surprised [him] because . . . it was a light plastic item as opposed to the wooden metal weapon that [Sgt. McClellan] would have assumed it was based on the look."[3] Lynch's SUMF, at ¶ 196; McKenna Cert., at Ex. G, pp. 33-34. Sgt. McClellan noted that there did not appear to be any movement by the Decedent, but had him secured and cuffed just to be safe, then deemed it clear for the paramedics and first aid to enter. Lynch's SUMF, at ¶ 196; McKenna Cert., at Ex. G, pp. 33-34.

---

[2] Sgt. McClellan arrived at the Nordstrom residence because he responded to a call over the radio indicating that an "officer need[ed] assistance" which generally means that "there is something significantly wrong, that there is a peril of danger." Lynch's SUMF, at ¶¶ 178-179; McKenna Cert., at ex. G, pp. 20-21, 24-25.

[3] The sawed-off shotgun that the Decedent pointed towards the Defendant Officers was later determined to be a toy gun. Lynch's SUMF, at ¶ 202. Sgt. McClellan testified during his deposition that the gun looked real because it did not have an orange cap on it like toy guns usually do. Lynch's SUMF, at ¶ 202; McKenna Cert., at Ex. G, p. 50-51. Similarly, the Decedent's nephew Andrew confirmed during the investigation that there was a toy gun "that looked like a shotgun in the shop." Lynch's SUMF, at ¶ 227; McKenna Cert., at Ex. B, pp. 122-123.

The Decedent was officially pronounced dead on May 30, 2010, at 2:24 p.m. by Doctor Gilman with the Monmouth Medical Center via telemetry with medics on scene.  Lynch's SUMF, at ¶ 232.  The Ocean County Prosecutor's Office ("OCPO") fully investigated the circumstances of the shooting and determined that Defendant Lynch's use of deadly force was justifiable under the law.  Lynch's SUMF, at ¶ 233; McKenna Cert., at Ex. R.  Similarly, the New Jersey Attorney General's Office reviewed the OCPO investigation and agreed that Officer Lynch's use of deadly force was legally justified.  Lynch's SUMF, at ¶ 234; McKenna Cert., at Ex. S.  Subsequently, Captain Klimakowski conducted an internal affairs investigation in order to determine whether the Manchester Police Department's policies and procedures had been properly followed and concluded that Officer Lynch's actions were justified, legal, and proper.  Lynch's SUMF, at ¶¶ 236-237.

On May 29, 2012, Plaintiff filed the instant case against Officers Lynch, Collins and Cavalcante, William Brase, Manchester Township, and the Manchester Township Police Department, seeking money damages and attorney's fees. Plaintiff's Complaint asserts four (4) causes of action: (1) Excessive use of force by Defendants Lynch, Collins and Cavalcante pursuant to 42 U.S.C. § 1983; (2) Supervisory liability of Defendants Manchester Township, Manchester Township Police Department, and Chief of Police William Brase pursuant to 42 U.S.C. § 1983; (3) Excessive use of force by Defendants Lynch, Collins, and Cavalcante in violation of the New Jersey Civil Rights Act, *N.J.S.A*. 10:6-1; and (4) a claim by the Decedent's father, Edward Nordstrom for emotional distress damages pursuant to *Portee v. Jaffee*.

## II.    DISCUSSION

### a.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Where the nonmoving party bears the burden of persuasion at trial, the moving party may be entitled to summary judgment merely by showing that there is an absence of evidence to support an essential element of the nonmoving party's case. Fed.R.Civ.P. 56(c)(1) (B); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Facts that could affect the outcome are 'material facts,' and a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp.*, 477 U.S. at 322-23)).

Further, where deadly force is involved and the victim is unable to testify, the Third Circuit has recognized that "a court ruling on summary judgment in a deadly-force case 'should be cautious … to ensure that the officer[s are] not taking advantage of the fact that the witness most likely to contradict [their] story – the person shot dead – is unable to testify." *Id*. at 181-182 (quoting *Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999)). As such, courts should avoid simply accepting self-serving accounts by the officers and should also consider the circumstantial evidence where, "if believed, would tend to discredit the police officer[s'] story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably." *Id*. at 182 (quoting *Abraham*, 183 F.3d at 294). It should be noted, however, that "this is not to say [ ] the summary judgment standard should be applied with extra rigor in deadly-force cases. Rule 56 contains no separate provision governing summary judgment in such cases." *Id*. Just as any summary judgment analysis requires, the party opposing such motion in a deadly-force case must still "point to evidence – whether direct or circumstantial – that creates a genuine issue of

material fact, and 'may not rely simply on the assertion that a reasonable jury could discredit the opponent[s'] account.'" *Id*. (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003) (citations omitted)).

        **b.**      **Analysis**

                **i.**      ***Excessive Use of Force by Defendants Lynch, Collins and Cavalcante pursuant to 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1***

"An excessive force claim under § 1983 arising out of law enforcement conduct is based on the Fourth Amendment's protection from unreasonable seizures of the person." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989)).  As such, "[a] cause of action exists under § 1983 when a law enforcement officer uses force so excessive that it violates the Fourth and Fourteenth Amendments to the United States Constitution."  *Id*. at 633-34 (citing *Brown v. Borough of Chambersburg,* 903 F.2d 274, 277 (3d Cir.1990)).  As stated above, ". . . summary judgment is appropriate if, as a matter of law, the evidence would not support a reasonable jury finding that the police officers' actions were objectively unreasonable." *Id*. at 634.

Here, the evidence would not support a reasonable jury finding that the Defendant Officers' actions were objectively unreasonable.  As an initial matter, the Court fails to see how Plaintiff may maintain an excessive force claims against Defendants Collins and Cavalcante because these Officers did not use any force at all against the Decedent.  Plaintiff attempts to establish an excessive force claim against these Defendants by alleging that a Fourth Amendment violation occurred when these Officers unlawfully entered and searched the garage, and allegedly failed to follow departmental policies.  However, Plaintiff fails to recognize that an excessive force claim is premised on the Fourth Amendment's protection from unreasonable *seizures* of the *person*, not

an unreasonable *search* of a *premises*.[4]  *Id*. at 633-34 ("Police officers are privileged to commit a *battery* pursuant to a lawful arrest, but the privilege is negated by the use of excessive force.") (emphasis supplied) (citing *Edwards v. City of Phila.,* 860 F.2d 568, 572 (3d Cir.1988)); see also *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 433 (D.N.J. 2011) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."))  Simply put, if no force was used whatsoever by the Officers upon the Decedent, it certainly cannot be said to have been excessive force for purposes of establishing a seizure in violation of the Fourth Amendment.

Moreover, the evidence would not support a reasonable jury finding that Officer Lynch's actions were objectively unreasonable.  Determining whether the force used was "reasonable" requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.  See *Graham*, 490 U.S. at 396.  Careful attention must be paid to the facts and circumstances of each particular case, including factors such as: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the individual is actively resisting arrest or attempting to evade arrest by flight.  *Id*.  Further, the Supreme Court has emphasized that in weighing these factors, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . [because] police officers are often forced to make split-second judgments—in circumstances

---

[4] Even if Plaintiff's argument surrounding the Officers entry into the garage was sufficient for purposes of an excessive force claim, the Court notes that the owner of the home, Edward Nordstrom, gave the Officers permission to enter the garage and was in the process of retrieving the key in order to let the Officers in.  See Plaintiff's Counter-Statement of Facts, at ¶ 46.  Further, the Decedent specifically told the Officers "you can come in, but I'm not coming out." Lynch's SUMF, at ¶ 114.  As such, the Officers did not violate the Fourth Amendment by entering and searching the garage, because they were on the premises with the consent of both the homeowner and Decedent.  See *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 2797, 111 L. Ed. 2d 148 (1990).

that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. (citation omitted).

The Third Circuit has also instructed that an officer need not "wait until he sets eyes upon a weapon before employing deadly force to protect himself against a [ ] suspect who . . . moves as though to draw a gun." *Lamont*, 637 F.3d at 183 (3d Cir. 2011) (quoting *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001)).  Rather, "[w]aiting in such circumstances could well prove fatal. Police officers do not enter into a suicide pact when they take an oath to uphold the Constitution."  *Id*. at 183.  In *Lamont*, the Third Circuit held that the troopers were justified in using deadly force since they reasonably believed that the suspect was drawing a gun; however, it later turned out that the suspect was holding a crack pipe.  Here, the Court cannot see how the facts of this case can be distinguished from those in *Lamont* in order to establish liability of Defendant Lynch.  Rather, Officer Lynch was justified in using deadly force since he reasonably believed that the Decedent was drawing a gun.  The fact that the Decedent was holding what appeared to be a shotgun is not disputed and Officer Lynch's mistaken belief that the shotgun was real must be forgiven, as the circumstances indicate that this mistake was reasonable.  See *Id*. ("[A]n officer who uses deadly force in the mistaken belief that a suspect is armed will be forgiven so long as the mistake is reasonable and the circumstances otherwise justify the use of such force.").  Defendant Lynch was forced into making a split second decision and reasonably believed that the safety of his fellow Officers was at risk.  Further, a review of the evidence does not discredit Officer Lynch's story nor could the evidence convince a rational fact finder that Officer Lynch acted unreasonably. *Id*. at 182. As such, his use of deadly force was justified and does not constitute a Fourth Amendment violation for purposes of Plaintiff's § 1983 excessive force claim.

Similarly, Plaintiff's excessive force claim pursuant to the New Jersey Civil Rights Act ("NJCRA"), *N.J.S.A.* 10:6-1 against Officers Lynch, Collins and Cavalcante must fail for these same reasons. "The New Jersey Civil Rights Act (hereinafter "NJCRA") was modeled after 42 U.S.C. § 1983, and creates a private cause of action for violations of civil rights secured under the New Jersey Constitutions." *Trafton*, 799 F. Supp. 2d at 443 (D.N.J. 2011). As such, "[t]his district has repeatedly interpreted [the] NJCRA analogously to § 1983." *Id*. (citing *Chapman v. New Jersey,* No. 08–4130, 2009 WL 2634888, *3 (D.N.J. August 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart"); *Slinger v. New Jersey*, No. 07-5561 (DMC), 2008 WL 4126181, at *5 (D.N.J. Sept. 4, 2008) *rev'd in part*, 366 F. App'x 357 (3d Cir. 2010) (noting NJCRA's legislative history, this district utilized existing § 1983 jurisprudence as guidance for interpreting the statute); *Armstrong v. Sherman*, No.09-716, 2010 WL 2483911, at *5 (D.N.J. June 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983")). Officers Lynch, Collins and Cavalcante are entitled to summary judgment on Plaintiffs NJCRA excessive force claim because, as expressed above, no Constitutional violation occurred and Officer Lynch's use of deadly force was objectively reasonable.

> ii. ***Supervisory liability of Defendants Manchester Township, Manchester Township Police Department, and Chief of Police William Brase pursuant to 42 U.S.C. § 1983***

Plaintiff alleges that the Manchester Township Police Department failed to implement policies, procedures, and training to effectively manage a suicidal, emotionally disturbed person, barricaded person situation, and to reasonably avoid the use of deadly force. As a result, Plaintiff contends, the Department did not adequately protect and serve the Decedent thereby rendering the Department, the Township, and Chief Brase liable under § 1983. "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action

11

that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690, 98 S. Ct. 2018, 2035-36, 56 L. Ed. 2d 611 (1978).  Importantly, however, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id*. at 691 (emphasis in original).  As such, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. at 694.

Moreover, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 1204, 103 L. Ed. 2d 412 (1989).  Stated differently, "'municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers." *Id*. (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985) (opinion of REHNQUIST, J.)).  Thus, only where a "deliberate" or "conscious" decision by a municipality – or, a "policy" as defined by earlier cases – can a city be liable for such a failure to train claim under § 1983.  *Id*.

Here, Plaintiff has failed to meet her burden that a genuine dispute of material fact exists with regard to a conscious decision or policy by Manchester Township, the Police Department and/or Chief Brase amounting to a deliberate indifference of the Decedent's constitutional rights. As an initial matter, the Court has already determined that the Decedent's constitutional rights

were not violated.[5]  In any event, even assuming that they were, Plaintiff has failed to establish

that the use of deadly force by Officer Lynch was the result of failing to properly train.  Rather,

the municipal Defendants have produced evidence revealing that the Township's officers received

the Attorney General's Use of Force training at least twice a year.  See Deposition of Defendant

Brase, 9:6-13; 21.  Further, an internal affairs investigation revealed that Defendant Lynch

properly complied with the policies and procedures of the Department.   Lynch's SUMF, at ¶¶

236-237.  To the extent that Plaintiff's claim against the municipal Defendants is based on

Defendant Lynch's application of the Department's policy in an improper manner, such claim must

also fail for liability would then rest on *respondeat superior*. *City of Canton*, 489 U.S., at 387.

There can be no dispute that the Manchester Police Department trained its officers

(including the Defendant Officers Lynch, Collins, and Cavalcante) in use of force principles as

established by the New Jersey Attorney General.  Plaintiff's expert contends that the police were

not trained, in particular, on how to deal with an emotionally disturbed person.  This argument,

however, is speculative as it assumes that the Decedent was in fact an emotionally disturbed person

and in any event, it is not enough to establish that the injury could have been avoided by more or

different training.  When a training policy is in place but a plaintiff argues that the training is

inadequate, circumstances under which municipal liability can be found are limited.  *Id*. at 387-

88.  As stated above, it is only when an alleged failure to train is infected by a *deliberate*

indifference to constitutional rights that a municipality can be held liable on a failure to train

theory. *Id*. at 388 (emphasis supplied).  Following the training guidelines established by the New

---

[5] Plaintiff cannot establish supervisory liability as against the Township, the Police Department, or Chief Brase because "any claim that supervisors directed others to violate constitutional rights necessarily includes as an element an actual violation at the hands of subordinates." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). Given that no constitutional violation occurred by the Defendant Officers, Plaintiff cannot maintain a claim for supervisory liability under § 1983.

Jersey Attorney General can hardly be said to constitute a deliberate indifference to the Decedent's rights by the municipal Defendants.  Accordingly, because Plaintiff cannot establish direct liability nor supervisory liability as against the municipal Defendants, Manchester Township, the Manchester Police Department, and Chief Brase are entitled to summary judgment on Plaintiff's § 1983 claims.

> ### iii.    Edward Nordstrom's Claim for emotional distress damages pursuant to Portee v. Jaffee

28 U.S.C. § 1367(c)(3) states that "[t]he district courts may decline to exercise [supplemental] jurisdiction over a claim under subsection (a) if—[ ] the district court has dismissed all claims over which it has original jurisdiction[.]"  Given that this Court has granted Defendants' motions for summary judgment on all federal claims, the only remaining cause of action in Plaintiff's Complaint is the Decedent's father, Edward Nordstrom's claim for emotional distress damages pursuant to *Portee v. Jaffee*, 84 N.J. 88, 417 A.2d 521 (1980).  This Court declines to exercise supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367(c)(3).

## III.    CONCLUSION

For the foregoing reasons, this Court GRANTS Defendant Lynch's Motion for Summary Judgment [docket #20]; GRANTS Defendants Cavalcante and Collins' Motion for Summary Judgment [docket #21]; and GRANTS Defendants William Brase, Manchester Township, and the Manchester Township Police Department's Motion for Summary Judgment [docket #22], and declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claim.  An appropriate Order accompanies this Opinion.


Date:  August 28, 2014                                    /s/ Joel A. Pisano
                                                          JOEL A. PISANO
                                                          United States District Judge